(No. 87-CC-3623-

KAREN L. HENNING and ROBERT F. HENNING, Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed November 10, 1993.*

ARIANO, ANDERSON, BAZOS, HARDY, KRAMER & CASTILLO (WILLIAM CASTILLO, of counsel), for Claimants.

ROLAND W. BURRIS, Attorney General (PETER BUS-
TAMANTE and ELIZABETH LOOBY, Assistant Attorneys
General, of counsel), for Respondent.

## OPINION

SOMMER, C.J.

This is an action by the Claimants, Karen L. Hen-
ning and Robert F. Henning (hereinafter referred to as
Mrs. Henning and Mr. Henning respectively) against the
State of Illinois, Respondent, for personal injuries sus-
tained by Mrs. Henning when the vehicle in which she
was a passenger was struck by a vehicle owned by the
State and operated by a State employee.

### Facts

On July 4, 1985, at approximately 8:00 p.m., the
Claimants, Mr. and Mrs. Henning, were travelling west-
bound on Route 20. Mr. Henning was driving the vehicle,
and Mrs. Henning was in the right front passenger seat.
Route 20 is a divided highway with two lanes for eastbound

and two lanes for westbound traffic. The Hennings' vehicle was travelling westbound in the far right-hand lane.

At the time of the incident, the traffic was heavy and gradually slowing as vehicles approached the McLean Boulevard exit. The Claimant's vehicle was struck from behind by a State-owned vehicle driven by Leonard Anderson, a State of Illinois employee working at Herrick House in Bartlett, Illinois. Mr. Anderson was driving in the course of his duties.

Mr. Henning testified that he remained in the far right-hand lane the entire time he was travelling on Route 20. He further stated that he was travelling about five miles per hour when he noticed the vehicle driven by Anderson rapidly approaching from the rear. Mr. Henning described the impact as a "very powerful, very dramatic, high impact," other witnesses described the impact in similar terms.

Mr. Anderson, on the other hand, testified that the Hennings' vehicle was travelling westbound in the left lane of traffic when it moved into the right lane, cutting off Mr. Anderson's vehicle. Anderson testified that he was unable to stop, and he struck the Hennings' vehicle.

Anderson was issued a citation for failure to reduce speed to avoid an accident, and he subsequently appeared in Court and pled guilty to the offense.

Mrs. Henning seeks damages against the Respondent for medical bills, pain and suffering, disability, and lost earnings as a result of the accident. Mr. Henning seeks damages for loss of consortium.

### Liability

It is undisputed that on July 4, 1985, Leonard Anderson was employed by the State of Illinois Department

of Children and Family Services and that he was within the scope of his employment at the time of the incident. It is also undisputed that the Claimant's vehicle was struck from behind by the State-owned vehicle operated by Anderson and that Anderson was issued and pled guilty in court to a citation for failure to reduce speed to avoid an accident.

Operators of State vehicles are charged with the same duty of care as other drivers and are liable for damages proximately caused by their negligent acts. (*Hewitt v. State* (1981), 35 Ill. Ct. Cl. 288, 289; *Santiago v. State* (1977), 31 Ill. Ct. Cl. 322.) Where a case involves a rear-end collision, that fact does not automatically create an inference that the driver of the rear car was negligent. It is for the trier of fact to determine whether the rear driver was acting reasonably under the circumstances. A driver's duty of reasonable care includes keeping a proper lookout and keeping his vehicle under control so as to avoid collisions. In addition a driver is required to maintain reasonable speed so that his vehicle may be safely stopped within the distance that objects may be seen ahead. *Hewitt v. State* (1981), 35 Ill. Ct. Cl. 291.

The courts have also repeatedly held that an admission of guilt in a criminal proceeding is an admission against interest on that issue in a subsequent civil proceeding. *People v. Chavez* (1985), 89 Ill. Dec. 525, 480 N.E.2d 1268.

In this case the facts strongly support the conclusion that Anderson failed to act reasonably under the circumstances. It is our finding that Anderson was negligent, and his negligence was the proximate cause of the resulting injuries. It was a clear, dry summer evening and the traffic was heavy. Anderson failed to maintain a proper lookout and a reasonable speed for the heavy traffic conditions.

There was no evidence to support Anderson's testimony that the Claimant "cut him off."

It is undisputed that the traffic was heavy and slowing, and even if the Claimant's vehicle had changed from the left-hand lane to the right-hand lane in front of Anderson, Anderson should have been able to reduce his speed and avoid the collision instead of creating a high impact collision. The fact that Anderson appeared in Court and entered a plea of guilty to the traffic offense further supports the Claimant's contention of Anderson's negligence.

## Damages

Mrs. Henning testified that the night after the accident she suffered from a headache, stiff neck, and a stiff back, and was unable to hold her head up by the next morning. On July 5, 1985, she went to Sherman Hospital Emergency Room where she was fitted with a cervical collar. After the emergency room treatment, Mrs. Henning made an appointment with Dr. Edward Kinn, an osteopath, and saw him on July 8, 1985. At that time, Mrs. Henning was experiencing weakness and tingling in her neck, headaches, tightness and pain in her entire back. Dr. Kinn gave Mrs. Henning an osteopathic manipulation to loosen her muscles and realign the bones in her back, and a dynawave. Mrs. Henning treated with Dr. Kinn two to three times a week for the remainder of 1985.

Mrs. Henning testified that throughout 1985, although her neck became better, she was having increased pain in her lower back and left leg such that on some days she could not walk and experienced sharp shooting pains in her legs. In March 1986, Dr. Kinn hospitalized Mrs. Henning for the severe pain in her lower back and legs. Mrs.

Henning testified that the pain severely limited her normal activities. At her discharge, Dr. Kinn diagnosed her with left sciatic neuritis secondary to a herniated disc.

From April 15, 1986, through approximately October 22, 1987, Mrs. Henning treated with Dr. Carey B. Dachman, a board certified specialist in rheumatology, a specialty which covers all disorders of the muscles and skeleton including arthritis. Under Dr. Dachman's care, Mrs. Henning was subjected to hundreds of trigger-point injections and seven or eight epidural steroid injections into the lower lumbar area and physical therapy, consisting of heat packs, massage, and electrical stimulation. From April 1986 through October 1987, while under Dr. Dachman's care, Mrs. Henning noticed that the pain in her muscles, joints, lower back and legs improved intermittently for short periods of time. Dr. Dachman noted that the results of an MRI performed on Mrs. Henning on March 15, 1986, were consistent with a herniated disc located in the lower lumbar spine. Dr. Dachman performed an EMG on Mrs. Henning in April 1986, which confirmed that the disc in question was pinching a nerve. After treating Mrs. Henning in April 1986, Dr. Dachman diagnosed her as having a herniated disc and a secondary problem called fibrositis, which is an inflammation of all of the soft tissues, which manifests itself through tissue tenderness and is brought on by trauma. Treatment includes physical therapy and muscle relaxers. Dr. Dachman also diagnosed Mrs. Henning as suffering from facet disease, which is similar to fibrositis except that the inflammation is in the joints, rather than the soft tissues. The treatment for facet disease is identical to the treatment for fibrositis. During the latter part of the summer of 1986, Dr. Dachman prescribed epidural injections for Mrs. Henning. In late August 1986, Dr. Dachman diagnosed Mrs.

Henning as suffering from *severe* facet disease. Dr. Dachman also testified that both fibrositis and facet disease can become chronic, meaning long-standing and permanent. Dr. Dachman continued to treat Mrs. Henning through 1986 and late 1987 on approximately 40 occasions.

After November 1987, Mrs. Henning discontinued treatment with Dr. Dachman until August 1991; during this period Mrs. Henning resumed treatment with Dr. Kinn. Dr. Kinn prescribed osteopathic manipulators, dynawave, and medications. Dr. Kinn's testimony substantially concurred with Dr. Dachman's regarding Mrs. Henning's condition and the causal connection of the auto accident to the injury. Dr. Kinn also offered unrebutted testimony that in his opinion, based upon a reasonable degree of medical certainty, Mrs. Henning suffered from severe chronic pain syndrome which is permanent in nature and will require additional medical treatment in the future.

On August 7, 1991, Mrs. Henning returned to Dr. Dachman with the same complaints for further evaluation. Dr. Dachman ordered an MRI and CAT scan, and Dr. Graham performed an EMG in late August 1991. Both the EMG and the CAT scan showed a bulging disc in the lower lumbar spine.

Finally, Dr. Dachman testified that based upon a reasonable degree of medical certainty, the condition with which he diagnosed Mrs. Henning in 1986 and again in August 1991, and for which he has rendered treatment to her, bore a causal relationship to her automobile accident of July 4, 1985. Dr. Dachman testified that the car accident in 1985, and the trauma she sustained, were the proximate causes of Mrs. Henning's condition. Dr. Dachman gave unrebutted testimony that Mrs. Henning's conditions were permanent, and that Mrs. Henning would

require further treatment, consistent with the treatment she is receiving now, for years to come. Dr. Dachman also testified that based upon a reasonable degree of medical certainty it was his opinion that Mrs. Henning would not be able to engage in full-time employment which would involve any lifting.

The Respondent did introduce evidence of a prior existing back complaint. Mrs. Henning had been treated by Dr. Kinn on November 2, 1981, for strain in the cervical spine, and was treated with osteopathic manipulation and dynawave. Mrs. Henning was again treated by Dr. Kinn on November 5, 1981, for lumbar-sacral and sacroiliac back pain. These strains and back pain were attributed by Dr. Kinn to Mrs. Henning's carrying her infant and were stated to be common among mothers with young children and were not permanent.

From the evidence presented, this Court finds that the proximate cause of Mrs. Henning's injuries was the auto accident of July 4, 1985. Additionally, this Court finds that Mrs. Henning's injuries were proven to be objective by the testimony of Drs. Kinn and Dachman and the fact that Mrs. Henning underwent literally hundreds of injections during the 1986-87 period in an attempt to relieve her condition. The Court believes that Mrs. Henning would not have undergone such if she were not genuinely in distress.

The Claimants have requested damages in the following categories: past and future medical bills, past and future pain and suffering, disability and lost earnings, and loss of consortium by Mr. Henning. .

In the matter of Mrs. Henning's medical bills, we find that at the hearing that certain medical bills were stipulated to, others were testified to by Dr. Kinn and Dr. Dachman

as being necessary and reflecting reasonable and customary charges, and incurred as a result of the injury complained of. The Claimant, Mrs. Henning, testified to other bills indicating that they had been paid. The State did not object to Mrs. Henning's testimony, but did by agreement exclude portions of the bills offered by Dr. Dachman as not being incurred as a result of the injury complained of.

The Claimant's brief indicates that the total of the medical bills admitted into evidence was $45,000. The State did not object to this amount in its brief. The Court, upon detailed examination of the transcript and the voluminous bills, finds the sum of $45,000 is substantially accurate.

Mrs. Henning can certainly anticipate future medical treatment for her condition. To this point, Mrs. Henning's treatment has been conservative. There was no testimony in the record concerning possible surgical intervention. On the other hand, Dr. Dachman testified that Mrs. Henning may require a conservative treatment of therapy, medication by injection, and anti-inflammatory drugs for many years. At the trial longevity tables were introduced which showed that Mrs. Henning could expect on the average to live another 43.3 years. Dr. Dachman and Dr. Kinn testified that her condition was permanent, but whether conservative treatment would be necessary throughout Mrs. Henning's life was not stated. We find that an award discounted to present cash value of $20,000 for future medical treatment is proper. If surgery is undertaken that amount would be adequate for both the surgery and recovery, and if conservative treatment is chosen, she would have available to her sufficient funds for said treatment.

In a claim such as this, we find that though disability and pain and suffering are two separate bases for recovery

under the law, they are intertwined. But for the pain, there would be no disability, and to the extent the pain is relieved, the disability would diminish.

In the claim for disability, we find that the Claimant has suffered injury which has diminished the quality of her life. Mrs. Henning was previously quite active, but now many activities that Mrs. Henning engaged in before the injury are not presently possible because of her disability. Such activities include gardening, normal maintenance work around the house and yard, sports and school activities. Both physicians testified that Mrs. Henning's condition was both permanent and chronic. Therefore, for both past and future disability, we award the Claimant $100,000.

In the claim for pain and suffering, we find that the Claimant's pain and suffering was substantial after the accident. She was in such pain that she could not walk and had to be hospitalized. After her hospitalization, in order to reduce her pain, she underwent hundreds of injections. Finally, she was able to return to Dr. Kinn's care for osteopathic manipulations, dynawave treatments, and medications. Later she went back to Dr. Dachman just prior to trial and had further tests. Both doctors testified that Mrs. Henning's condition was chronic and permanent and that further treatment would be necessary for many years to come. We find that Mrs. Henning was in great pain for the first year or so after the accident, but after being in the care of Dr. Dachman until October of 1987, she returned to Dr. Kinn who continued his conservative treatment of manipulation, dynawave, and medication. Whether Mrs. Henning's pain had subsided when she returned to Dr. Kinn is not in the record. We do note that she had no further hospitalization between October 1987 and 1991, nor were substantial medical tests performed

on her in that period. We conclude that though the Claimant had pain, the treatments of Dr. Dachman and Dr. Kinn alleviated the pain somewhat. Mrs. Henning reported at the time of the trial that she had difficulty sleeping because of pain. She testified that she sleeps on the couch three nights a week in order to get sleep, but her sleep is disturbed every three or four hours because of pain. Therefore, for both past and future pain and suffering, we award Mrs. Henning $100,000.

The Claimant has made a claim for lost earning capacity. The test is whether the Claimant is able to perform meaningful work for which she is qualified. There is nothing in the record to indicate that the Claimant had any particular training or educational background. Mrs. Henning testified that it was her desire to become a nurse. She had taken introductory courses in nursing the year prior to her accident and had worked at doctors' offices and hospitals. She was not working at the time of the accident nor was she taking nursing training. This Court finds that whether Mrs. Henning would have become a nurse is speculative. Dr. Dachman testified that the Claimant could do sedentary work but could not work as a nurse as such would require lifting. The Claimant introduced no other evidence of her desire to return to work, and was not working at the time of the accident, but she did have a work history. No evidence was introduced to show a diminution of her earning capacity because of her condition if she were to return to work which she had previously done or for which she was qualified. Therefore, we find that Mrs. Henning has not proven her claim for lost earning capacity. We will make no award for lost earning capacity.

As for the claim of loss of consortium, there was very little testimony on the matter. The Claimant's post-trial

brief does not cite consortium as an element of damages sought, though the reply brief does. Mrs. Henning testified that she and her husband previously engaged in extensive social activity including bowling together often, but since the injury the couple's social activity has declined to almost nothing. Mrs. Henning also testified that there was a drastic decline in the couple's sexual activity since the injury. No claim was made for loss of services, nor was any value established for any loss of services. The Court finds that the Claimants have proven a minimal loss of consortium, for which we will award to Mr. Henning the sum of $5,000.

In summary, we award:

$  45,000—past medical
   20,000—future medical
  100,000—past and future pain, suffering
  100,000—disability
    5,000—loss of consortium
$270,000—Total

Furthermore, a lien in the amount of $3,791.38 has been filed by a medical insurer, ANPAC. We will deduct this amount from the Claimant's award.

Therefore, it is ordered that ANPAC be awarded $3,791.38 in satisfaction of its lien, and Karen Henning be awarded the sum of $261,208.62 in full and complete satisfaction of her claim, and that Robert Henning be awarded $5,000 in full and complete satisfaction of his claim.